ELVINA BRAASCH ET AL., APPELLANTS, V. CEMETERY ASSOCIA-
TION OF THE EVANGELICAL LUTHERAN CHRIST SOCIETY
OF NORFOLK, NEBRASKA, ET AL., APPELLEES.

FILED JUNE 3, 1903. No. 12,829.

1. **Injunction:** CEMETERY. A court of equity will enjoin the use of a tract of land for cemetery purposes so situated that the burial of the dead there will injure life or health, either by corrupting the surrounding atmosphere, or the water of wells or springs.

2. **Cemetery:** NUISANCE. A burial ground near dwellings is not necessarily a nuisance, and the court will only interfere and enjoin its use on clear and convincing proof of probable injury.

3. **Evidence.** Evidence examined, and *held,* insufficient to sustain an injunction.

APPEAL from the district court for Madison county: JAMES F. BOYD, DISTRICT JUDGE. *Affirmed.*

*H. F. Barnhart* and *Fred H. Free,* for appellants.

*William V. Allen, Willis E. Reed* and *D. J. Koeningstein,* contra.

BARNES, C.

The appellants, plaintiffs in the court below, brought this action in the district court for Madison county, to obtain a permanent injunction against the Cemetery Association of the Evangelical Lutheran Christ Society of Norfolk, Nebraska, C. H. Krahn, August Lenz, C. F. Haase, August Mathieson, Anton Bucholz and William Brummond, officers of said association, forever restraining them from establishing or continuing a cemetery for the burial of the dead, on a certain tract of land hereinafter described. The allegations of the petition were substantially as follows:

"That plaintiff, Elvina Braasch, is the owner of a life estate in the following described land, to wit, commencing at the northwest corner of the southeast quarter of the northwest quarter of section 22, in township 24, range 1 west·of the 6th P. M., running thence due south 100 rods, thence due east to the right of way of the Fremont, Elkhorn & Missouri Valley Railway Company, thence along said right of way in a northwesterly direction, to a point directly opposite the place of beginning; thence due west to the place of beginning, containing 18 and 80-100 acres; that the remaining plaintiffs are the heirs at law of one Herman Braasch who died seized of the said premises, and have each an undivided one-tenth interest in said lands subject to the life estate of his widow, their co-plaintiff; that many years prior to the 3d day of July, 1901, the said Herman Braasch made improvements upon said lands and premises, and erected thereon residence buildings, caused wells to be dug therein, and ever since

said time said wells have been used by said Herman
Braasch and his family, including the plaintiffs, for gen-
eral and domestic purposes, and they are and have been
dependent thereon for their water supply for said pur-
poses; that Herman Braasch caused a cellar to be ex-
cavated beneath the residence situated on said land, and
ever since said time the same has been and now is being
used for the storage of food products for the plaintiffs,
residents thereon; that said premises are situated on the
eastern slope of a high hill or elevation of land, and said
land extends to within twenty or thirty feet of the point
of the highest elevation of said hill; that said elevation
and slopes thereof are composed of a porous, unstratified
clayey deposit, known geologically as loess, through
which, by reason of its porous nature, all fluids and gases
readily percolate; that for a great depth thereunder there
is no strata impervious to the percolation, seepage or
passage of fluids. That the defendant cemetery associa-
tion was organized on the 3d day of July, 1901, and in
pursuance of its organization it became on or about the
23d day of August, of said year, the owner of the follow-
ing described real estate, to wit: commencing at the south-
east corner of the southwest quarter of the northwest
quarter of section 22, in township 24, range 1 west of the
6th P. M., in the county of Madison and state of Nebraska,
running thence west forty rods, and thence north twenty
rods, thence east forty rods, thence south to the place
of beginning, containing about five acres; that by virtue
of its ownership it entered into the possession and con-
trol thereof, and in the further prosecution of the main
design of said association caused the said tract to be
platted into cemetery lots and blocks, to be sold for ceme-
tery purposes; the said defendants are in possession and
control of the premises, and are advertising and offering
said lots for sale, under the rules of said society, for the
purpose of the interment of dead bodies or human remains
on said premises; that said cemetery tract is situated and
abuts upon the western side of the lands belonging to the

plaintiffs, and upon the summit of the hill or elevation of land, as above stated, and is many feet above the lands of the plaintiffs; that the soil thereof is of the same porous unstratified clayey substance known as loess, and is likewise without any strata impervious to the passage of fluids and gases; that the ground upon which said cemetery is located, slopes in nearly every direction from the high elevation upon which it is situated; that the surface drainage from said cemetery will necessarily be carried along and upon the lands belonging to these plaintiffs; that subterranean percolations from underneath the cemetery will necessarily penetrate under the lands of the plaintiffs and adjoining lands; and that if the defendants are allowed to continue the main design of said association, and the said cemetery becomes occupied and filled with human interments, the decomposition of human remains therein interred will necessarily contaminate, poison and infect the subterranean streams of water in that locality, and will cause the wells and cellars already existing there for the use of inhabitants of the lands belonging to the plaintiffs to become dangerous, unhealthful and unfit for use, and that the gases arising from said decomposition will cause the air in the immediate locality of said proposed cemetery to become unhealthful, and said lands adjoining, thereby unfit for human habitation; that if the defendants are permitted to continue in the establishment and operation of said cemetery upon the lands by them dedicated and assigned for such purposes, the lands of these plaintiffs will become wholly valueless and worthless, and unfit to be used for residence purposes, whereby plaintiffs will suffer a great and irreparable injury for which they have no speedy or adequate remedy at law, and will be wholly remediless unless, by interposition of a court of equity, the defendants be forever enjoined from carrying on and continuing their wrongful and illegal purposes aforesaid." The petition concluded with a prayer for a permanent injunction.

The answer of the defendants admitted the ownership of

the tract of land first described to be in the plaintiffs; that Elvina Braasch had a life estate therein, and that the other defendants had a reversionary interest in the said land, and were each the owners of an undivided one-tenth part thereof; admitted that Herman Braasch made the improvements and dug the wells upon the premises, as alleged in the petition; admitted the corporate organization and existence of the defendant cemetery association; that the persons named in the petition were its officers, as therein alleged; admitted the purchase and ownership of the tract of land; that it was purchased and was to be used for cemetery purposes; admitted that the said tract abutted upon the west side of the plaintiffs' lands, and denied each and every other allegation in the petition.

Upon these issues the cause was tried, and at the close of the plaintiffs' evidence the defendants moved the court to dismiss the action for the following, among other reasons: That there was no evidence introduced to show, or from which an inference can be drawn, that the wells in question, or the wells that will probably be dug or constructed upon the Braasch tract, will be contaminated by any deposits resulting from interments of human bodies in the cemetery tract.

The trial court sustained the motion, and dismissed the plaintiffs' cause of action; from the judgment thus rendered the plaintiffs appeal to this court.

The appellants contend that the court erred in sustaining the motion and dismissing their case, and in support of such contention has filed a brief, in the preparation of which counsel has taken much pains and show considerable erudition. Counsel for the appellees as strenuously, and with no less skill and ability, argue in support of the judgment. Under our present rules it becomes necessary for us to carefully review the evidence and form our independent conclusions of fact and law. This we will proceed to do.

It will be observed that two propositions are urged by appellants: *First*, that the surface water falling

upon the cemetery tract will flow upon, across and over their land, and thus contaminate their wells and render them dangerous to their health and comfort; *Second,* that the bacteria which inhabit and are generated in decomposing human remains will escape from the receptacles of interment and enter the earth, and by subterranean seepage or flowage from the cemetery reach the premises of the plaintiffs and become infiltrated in the water of the wells and thus poison and render it unfit for use and injurious to health.

It is the settled law of this state that a use made by one of his property which works an irreparable injury to the property of his neighbor, or whereby the unwritten but accepted law of decency is violated, or which deprives his neighbor of the reasonable and comfortable use of his property, or will probably injure the health or life of his neighbor, is a private nuisance and may be enjoined. *Lowe v. Prospect Hill Cemetery Ass'n,* 58 Neb. 94; *Farrell v. Cook,* 16 Neb. 483; *Barton v. Union Cattle Co.,* 28 Neb. 350; *Anheuser-Busch Brewing Ass'n v. Peterson,* 41 Neb. 897; *Beatrice Gas Co. v. Thomas,* 41 Neb. 662.

It is equally well settled that in such a case, to authorize an injunction, it must be established by satisfactory evidence that the threatened or apprehended injury will probably result. It is also the rule that a burial ground near dwellings is not necessarily a nuisance, and its use can only be enjoined on clear proof of probable injury.

Having in view these principles we will proceed with our examination of the questions involved herein. No dispute arises as to the *locus in quo,* and it appears that the cemetery tract of land abuts onto the appellants' tract near the middle, and on the west side of it for a space of twenty rods. The appellants' land is irregular in shape, being widest at the south end; is 100 rods in length, and as before stated contains 18 and 80-100 acres. A part of it lies on the hillside; it slopes down to the valley of the Northfork river, and a portion of it is situated in said

valley.   From the highest point on the cemetery tract the
slope is to the north and east into a large ravine which
drains its surface, and also the surface of Prospect Hill
Cemetery, and two others which lie near by to the north
and west.   This large ravine empties its waters into the
Northfork valley across the north end of the appellants'
land; the buildings and wells in question are near the
southeast corner of said land; the stock well is about
fifty feet south of a line drawn due east from the south-
east corner of the cemetery tract, and the house well is
125 feet still farther south; the stock well is 570 feet, and
the house well 682 feet from the nearest point of the
cemetery tract; the stock well is 25 feet deep, and the
house well 23 feet deep.   The highest point on the ceme-
tery tract is about 100 feet above the water in these wells.
There is a small ravine starting on the east side of the
cemetery tract and running to the northeast into the
large ravine, so that all the water which falls on the sur-
face of said tract flows and is carried off to the north-
eastern part of the appellants' land, and none of it ever
reaches the vicinity of their house, barns and wells; the
slope of the hill is about twenty degrees; the land is used
for pasturage, and is in its natural state, being covered
with grass or what is called green sward.   This descrip-
tion alone is sufficient to dispose of the question of the
surface drainage or surface water.   It is apparent, with-
out further discussion, that appellants failed to establish
their right to an injunction so far as that branch of the
case is concerned, and the matter will not be again re-
ferred to.

We will now consider the contention relating to the
percolation of subterranean waters, from the cemetery
tract to the plaintiffs' wells.  The record shows that it is
570 feet from the nearest point of the cemetery to the
nearest well, and that from the surface of the ground at
the highest point in the cemetery to the level of the water
in this well, is about 100 feet; that the soil for the whole
distance and depth is a clayey substance called loess,

without fissures or seams; that there are no percolating waters or streams, and no veins of water therein; that the soil, while highly porous, is so solid that when excavated the sides of the excavations, such as wells or cellars, not exposed to the destructive elements of weather and water, will stand like a cement wall for a generation; that while it readily absorbs water it at the same time acts as a filter. It further appears that the water in the wells on appellants' land and in that vicinity, is found at a uniform depth, and in a strata of water bearing sand interspersed with small stones or gravel. Fred Braasch testified that he was present when the house well was dug in the year 1866; that the soil was clay all the way down until they came to the water which was in sand and came in from all directions. Another witness testified that he dug a well at one time near the tract of land in question and just north of the cemetery tract, upon the slope leading from the cemetery north and to the east; that the soil was clay all the way down until he struck the water; that he dug a well on the tract known as the Cotton land, a little farther north; that the soil was clay all of the way down to the water; that when he struck water he also struck stones or gravel in the bottom of the well. A third witness also testified that he had dug wells in that vicinity; that the soil was clay, and that when they got down to the water it came in around the sides; that he curbed the well which he dug by putting in one piece of curb at the bottom and one at the top.

It is thus shown beyond question, that the water in appellants' wells does not come from the seepings or percolations of surface water through the soil, because in digging them no water was found, and none came in by seepage from any direction until the water bearing strata was reached. It appears that the water in this strata does not flow, and has no current or movement in any direction, because the well diggers all say that when the water was struck it came in equally from all sides. Appellants attempted to prove that the soil was so porous that it would

take up and absorb 90 per cent. of the water falling thereon, amounting to many millions of gallons each year, and in such quantities as to take up the bacteria, bacilli, toxins and ptomains, release them from the decomposing human bodies interred in the cemetery and carry them through the soil a sufficient distance to poison and pollute these wells, and to that end showed by certain scientific persons that the average absorption of the rainfall in this state is 90 per cent. This evidence is entirely beside the mark, because we know without resorting to the evidence of experts, that nearly all the water which falls on the slopes of a hill having an elevation of approximately twenty degrees, and which is in a state of nature, being covered by sod, will run off, and there will be scarcely enough of it absorbed to sustain ordinary vegetable life; that grass growing thereon will frequently perish for want of moisture. In view of these facts the evidence given by doctors Mackay and Crummer, the principal witnesses for appellants, loses all of its probative force. Doctor Crummer, after attempting to qualify himself as an expert, testified as follows:

Q. If a cemetery, or place of sepulture, were situated upon the summit of a hill which, together with its slopes, is composed of a uniformly porous soil, without having in the soil any strata impervious to water for many feet down, would the germs or spores of poisonous products from dead and diseased bodies containing ptomains or germs of these various diseases (referring to typhoid fever, diphtheria and tuberculosis), would these germs and poisons be liable to be carried by percolating waters through the soil, so as to contaminate the water in wells dug upon the slopes of such hill; the water level in said wells being at least 80 to 100 feet below the level of the dead body or bodies buried in the cemetery above, and the distance from such cemetery being approximately 250 to 350 feet?

A. In a porous soil a well drains a cone shaped area, the base of which is on the ground, and naturally the

apex at the bottom of the well, which base is in feet laterally the square of the depth of the well; that is the standard rule for measuring the distance laterally which will be drained by a well. A well 35 feet deep would drain an area of 1,225 feet in diameter, which would be 612 feet on either side of the well; a well 50 feet deep drains an area of 2,500 feet in diameter; so that the distance a contamination might reach a well increases very rapidly as the depth increases. A well 50 feet deep would drain twice as wide an area as a well 35 feet deep. It would be liable to carry the contamination from a cemetery into these wells.

Q. Would or would not such wells as you have described under such conditions be dangerous to the health of persons using the water for domestic purposes?

A. They would, surely so.

It thus appears that the hypothetical question put to this witness does not correspond to the situation or the distances as shown by the evidence, and that his answers do not respond to the conditions which exist in the case at bar. The witness was asked upon cross-examination the following question:

Q. Do you know how far surface water passing through a cemetery can be transmitted through the soil before it becomes sufficiently pure as not to be at all dangerous to health?

A. I do not know that we have any absolute data upon that particular subject.

The doctor then proceeded to illustrate by the well known and historical example of a well in Germany, which became infected with drainage from a distant village, through the soil. In that case, however, there was a large, open crack in the top of the ground which was supposed to facilitate the flow of poisonous material. In order to test it they put four barrels of salt in this crack, and the water three or four miles away became infused with salt in a few hours. It was evident that there was a subterranean stream which facilitated the carrying of

the poisonous materials to the point in question, while in the case at bar no such condition exists. In the testimony of doctor Mackay we find the following:

Q. Suppose the body of a person dying from typhoid fever, tuberculosis or diphtheria, or any of the enteric diseases, was buried in a porous soil upon the summit of a hill or elevation of ground, the summit and slope of the hill itself being of loess formation, the body being buried in the ordinary manner, the soil being of such a nature as to permit percolating or subterranean waters to pass directly through it, would the presence of such a body containing the germs of the diseases mentioned be a menace and a danger to the health of persons living upon the slope of the hill, upon the summit of which this cemetery is placed, and drawing water supplied for domestic purposes from an open well dug into the slope of the same hill upon which the cemetery is placed, the summit of the hill being at least 75 feet above the bottom of the open well dug upon the slopes and directly below the cemetery?

A. My answer to that would be, that reasoning from analogy from cases where it has been determined that contamination resulted from the pollution of the water drawn from a similar watershed, the presumption would be that such a cemetery would constitute a menace to the health of those drawing water from wells in its vicinity, if not immediately, then in years following.

This is the kind of evidence from which we are asked to find that the appellants have established, by clear proof, a case of probable injury. The case of *Lowe v. Prospect Hill Cemetery Ass'n, supra,* is strenuously pressed upon our consideration as being in point and authorizing us to grant the relief prayed for. An examination of that authority discloses that the wells in question therein were just across narrow streets in a well settled portion of the city of Omaha, the distance not exceeding 75 feet from the proposed cemetery. It further appears in the opinion that the land adjoining was laid out into lots and blocks, and many of them were occupied for residence purposes.

In such a case the conditions would amply justify the court in finding that the wells so situated would be likely to be poisoned and contaminated by the use of the tract for the interment of dead bodies; that the danger to the health and welfare of those using water from the wells and residing upon the lots in which they were dug, would be imminent; while in the case at bar the distance from the cemetery tract to the appellants' wells is so great that no comparison can be made between the two cases, and one is no authority for a decision of the other.

From the facts shown in the record we are constrained to hold that the appellants failed to prove the existence of conditions which would justify a reasonable belief that the acts complained of would result in any injury whatever to their health and comfort.

In order to authorize a court of equity to interfere, it must be made to clearly appear, by competent evidence, that it is reasonably certain that the anticipated injuries will probably occur. The law protects against real wrong and injury combined, but not against either or both when merely conjectural or fanciful. *Kingsbury v. Flowers,* 65 Ala. 479, 39 Am. Rep. 14; *Adams v. Michael,* 38 Md. 123, 17 Am. Rep. 516; *Begein v. City of Anderson,* 28 Ind. 79; *Town of Lake View v. Letz,* 44 Ill. 81; *Dunning v. City of Aurora,* 40 Ill. 481; *Newark Aqueduct Board v. City of Passaic,* 45 N. J. Eq. 393, 18 Atl. 106; *Shivery v. Streeper,* 24 Fla. 108; *City of Greencastle v. Hazelett,* 23 Ind. 186.

The evidence not being sufficient to sustain a decree in favor of appellants, it follows that the judgment of the trial court was right and we recommend that it be affirmed.

Albert and Glanville, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.