# ADELIA NELSON v. SWEDISH EVANGELICAL LUTHER-AN CEMETERY ASSOCIATION.[1]

May 27, 1910.

Nos. 16,550—(69).

**Cemetery — nuisance.**

Whether or not a cemetery is a nuisance is a question of fact, to be determined by the circumstances of each case.

**Same — injunction.**

When it appears that a place of sepulture is so situated that the burial of the dead there will injure life or health, either by contaminating the surrounding atmosphere or the water of wells or springs, the court will grant an injunction to restrain such use of land. Clark v. Lawrence, 59 N. C. 83, followed and applied.

**Same — evidence.**

A court of equity will not, however, interfere, unless it clearly appears by competent evidence that a nuisance will be brought into existence by acts sought to be restrained, and that the parties complaining will be injured unless the injunction is granted; but this does not mean that there must be absolute certainty of injury in order that the injunction be issued.

**Same — right of private citizen.**

To entitle a private individual to enjoin a public nuisance, the injury complained of must be peculiar in kind or nature, and not merely in degree, and not shared in common with the public at large, substantial, not fanciful nor evanescent, and the proximate result of the conduct complained of.

**Same — findings.**

Plaintiff, the owner of premises near land about to be used as a cemetery, applied for an injunction to restrain its use for that purpose. It is *held* that under the findings of the court, and under the circumstances proved, the injunction should be issued.

[1]Reported in 126 N. W. 723, 127 N. W. 626.

[Note] As to injunction by municipality against maintenance of cemetery, see note to Red Wing v. Guptil (Minn.) 41 L. R. A. 323.

Action in the district court for Chisago county for an injunction to restrain the Swedish Evangelical Lutheran Cemetery Association of Chisago City from depositing or interring human bodies in its cemetery. The complaint, after describing the situation of Chisago City upon a strip of land between two large bodies of water about twenty-five hundred feet apart, and not over twenty-five feet higher than the level of the lakes, alleged that the premises of plaintiff, which are used by her and her family as a residence and contain a well on which she and her family are dependent for water, are immediately north and distant about eighty feet from the northerly line of defendant's cemetery and her well is distant about one hundred fifty feet from that line; that the soil of the locality is composed of a porous, unstratified, clayey deposit known geologically as "loess," which by reason of its porous nature allows all fluid and gases to percolate and pass freely through its substance; that the tract platted by defendant as a cemetery is upon a slightly higher level than plaintiff's premises; that the subterranean percolation from underneath the cemetery will necessarily penetrate under the lands of plaintiff and adjoining land, and if defendant is allowed to fill its cemetery with interments, the decomposition following thereon will necessarily contaminate and infect the subterranean streams of water in that locality, and will cause the walls and cellars already existing there for the use of the inhabitants of the lands, including those of plaintiff, to become dangerous, unhealthful and unfit for use, and the gases arising from said decomposition will cause the water in the immediate locality of said proposed cemetery to become unhealthful and said lands adjoining thereby unfit for human habitation; that, by reason of the land being in such close proximity to two large bodies of water and the surface of said soil being so low, the soil underneath said town is necessarily soft and porous and strongly pregnant with water, which seeps and percolates through in different directions in the main wells in said city; that if bodies are allowed to be deposited in said cemetery, poisonous gases will percolate through into the water-bearing soil to the wells in the vicinity, including plaintiff's, and thereby poison the same and endanger the lives of persons using the water in said wells. Defendant

admitted that its plat contained one hundred forty cemetery lots of which thirty-three had been sold and conveyed, and alleged that the complaint did not state facts constituting a cause of action.

The case was tried before Crosby, J., who made findings of fact, as stated in the opinion, and as conclusion of law ordered judgment in favor of defendant. From an order denying plaintiff's motion for a new trial, she appealed. Reversed and new trial granted.

*J. C. Nethaway,* for appellant.

*Alfred P. Stolberg,* for respondent.

JAGGARD, J.

Plaintiff and appellant brought this action to enjoin defendant, its officers and employees, from using certain property for cemetery purposes. The trial court, in substantially its own words, found that "the land platted [as a cemetery] is composed of about one foot in depth on the surface of loam, underneath which there is a stratum of clay, about twenty feet in depth, underneath which is sand. In said stratum of clay there have been found in some places a few small veins about an inch in diameter, some of which are vertical, some horizontal, and some oblique, but to what distance was not shown. Good water to supply wells can be obtained on the grounds * * * at a depth of about forty feet. The elevation of the cemetery ground is about two feet higher than the plaintiff's land, and it slopes northerly towards plaintiff's land. The well on plaintiff's premises is situated one hundred fifty feet from said cemetery, and the house thereon is situated two hundred fifty feet from said premises. There are a number of residences and wells situated within a radius of eight hundred feet of said cemetery. The highest point of ground between the lakes between which the cemetery was situated is forty feet." The trial court found that plaintiff was not entitled to the relief sought.

The general principles of law as to enjoining the use of land for a cemetery are well settled. A cemetery is not necessarily a nuisance. Whether or not it is a nuisance is a question of fact, to be determined by the circumstances of each case. Dunn v. City, 77 Tex. 139, 11 S. W. 1125; Braasch v. Cemetery, 69 Neb. 300, 95 N. W. 646;

Woodstock v. Hager, 68 Vt. 488, 35 Atl. 431; Elliott v. Ferguson, 37 Tex. Civ. App. 40, 83 S. W. 56. If in fact it is a nuisance, parties threatened by its harm are not compelled to resort to legal remedies only. They may avail themselves of equitable remedies, as by way of injunction.

In Mugler v. Kansas, 123 U. S. 623, 673, 8 Sup. Ct. 273, 303, 31 L. Ed. 205, Harlan, J., said: "The ground of this jurisdiction, in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress * * * whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community." And see Missouri v. Illinois, 180 U. S. 208, 21 Sup. Ct. 331, 45 L. Ed. 497, where the threatened daily transposition by Chicago of large quantities of sewage and accumulated deposits, which would poison the water supply of Missouri and injuriously affect portions of the bed of the Mississippi river, was enjoined in advance of any actual injury sustained thereby.

More specifically, Battle, J., said: But when it appears "that a place of sepulture is so situated that the burial of the dead there will endanger life or health, either by corrupting the surrounding atmosphere or the water of wells or springs, the court will grant its injunctive relief upon the ground that the act will be a nuisance of a kind likely to produce irreparable mischief and one which cannot be adequately redressed by an action at law." Clark v. Lawrence, 59 N. C. 83, 78 Am. Dec. 241; Lowe v. Prospect Hill, 58 Neb. 94, 78 N. W. 488, 46 L. R. A. 237 (cemetery). And see Laflin v. Tearney, 131 Ill. 322, 23 N. E. 389, 7 L. R. A. 262, 19 Am. St. 34; Barnes v. Hathorn, 54 Me. 124; Gilford v. Babies Hospital (Sup.) 1 N. Y. Supp. 448 (babies' hospital enjoined in residential district, because of the probability of dissemination of babies' diseases); Rodenhausen v. Craven, 141 Pa. St. 546, 21 Atl. 774, 23 Am. St. 306 (enjoining the establishment of carpet cleaning in-

dustry because of danger of infection by dust); Pierce v. Gibson, 107 Tenn. 224, 64 S. W. 33, 55 L. R. A. 477, 89 Am. St. 946 (injunction to prevent the connection of closets in courthouse with an open ditch); Miley v. O'Hearn, 13 Ky. Law Rep. 834, 18 S. W. 529 (injunction granted to prevent an adjoining landowner from building a closet in close proximity to plaintiff's house and well).

A court of equity will not, however, interfere unless it clearly appears by competent evidence that a nuisance will be brought into existence by the acts of the parties sought to be restrained, and that the party complaining will be injured unless the injunction is granted. Dunn v. City, supra; Braasch v. Cemetery, supra; Upjohn v. Board, 46 Mich. 542, 9 N. W. 845, 41 Am. Rep. 178; City v. Hazelett, 23 Ind. 186. And see 5 Am. & Eng. Enc. (2d Ed.) 791; 29 Cyc. 1169. And see 12 Current Law, 1123, § 4; 10 Current Law, 1036. If the injury be doubtful, conjectural, or contingent, equity will not interfere. Dilworth's Appeal, 91 Pa. St. 247. But this does not mean that there must be absolute certainty of injury in order that the injunction be issued. As Holt, J., said in Miley v. O'Hearn, supra: "If so, it could rarely be invoked. It is true the party cannot act upon a mere fear or apprehension, a mere possibility or theoretical injury; but, if the danger be provable and threatening, he may invoke its aid, and need not delay until the injury is actually inflicted."

Whether or not in a given case an injunction will be issued to restrain the use of land for cemetery purposes depends upon the facts proved in each case. An injunction was refused, for example, in City v. Hazelett, 23 Ind. 186. It is to be noted, however, that the law as to correlative rights in subterranean streams in force in Indiana when this case was decided was largely undetermined. In this state the doctrine of "sic utere," too, in large measure governs. Erickson v. Crookston Waterworks, P. & L. Co., 100 Minn. 481, 111 N. W. 391, 8 L. R. A. (N. S.) 1250. In Wahl v. Methodist, 197 Pa. St. 197, 46 Atl. 913, an injunction was refused. In Lowe v. Prospect Hill, supra, it was granted. In the latter case the wells in question were just across the narrow street, not exceeding seventy five feet from the proposed cemetery. In the former case the nearest

point in the cemetery was five hundred seventy feet from the nearest well. It is significant that in the latter case the soil was a clay substance called "loess," without fissures or seams. Whether this was the formation in the case at bar is one of the present controversies.

2. Defendant has argued, upon the assumption of the truth of plaintiff's position it must follow that many other persons would be similarly injured. Thus it appears that the injury was public, that therefore plaintiff cannot prevail, and that the public alone was given a remedy. In point of fact this proof tended not to defeat, but to establish, plaintiff's right. If defendant's reasoning were accepted, then the larger the place in which land was used for a cemetery, and the more people it would injure, the more certainly could no individual complain.

It is elementary that this is not the law. To entitle a private individual to enjoin a public nuisance, it is elementary the injury complained of must be (a) peculiar in kind or nature, and not merely in degree, and not shared in common with the public at large; (b) substantial, not fanciful or evanescent; and (c) the proximate result of the conduct complained of. There can be no reasonable question that in this case plaintiff claims such an injury, and if her proof sustains such allegations she is entitled to the relief prayed for. Even in the cases in which an equitable relief has been refused, it has been invariably recognized that in a proper case an injunction will lie to restrain the use of a tract of land for cemetery purposes so situated that the burial of the dead therein will injure life and health and corrupt the water of the wells.

3. The real question in this case concerns, not the legal sufficiency of plaintiff's claims, but the sufficiency in fact of the evidence introduced to sustain them, under well-settled rules of law.

The situation is simple. Under the surface soil is a deep stratum of clay. Underneath that clay is a sand or gravel stratum, bearing water. Plaintiff's premises are situated one hundred fifty feet from the cemetery. Plaintiff insists, and defendants deny, that the clay soil was impervious to moisture. The findings of the trial court and the evidence fully sustain plaintiff's position. The court found

that there were veins in the clay subsoil extending vertically, horizontally, and obliquely; that is, "there were holes in the skimmer." But the evidence is much stronger than the findings. The record shows that there were seams of the gravel and sand found in the clay subsoil in this immediate vicinity.

One qualified and unimpeached witness testified, substantially in his own language: You can't dig four feet square in there nowhere without striking gravel veins. They were found in the upper part of the cemetery block. I saw water come into that grave [the witness had seen dug in the cemetery "last fall"] from one of the veins. * * * I dug a grave in the vicinity something like five feet, and found at least two veins of sand; two big ones." Another witness testified that he had dug two graves there, and found two small veins. Cellars in the vicinity showed veins. A third witness testified he had found veins of various sizes within two blocks of plaintiff's land. "Some were big; some small; some as big as my arm." Another witness had found veins a foot in diameter, and smaller ones.

Defendant has laid considerable stress upon the statement of one of plaintiff's witnesses: The veins "are [not] continuous." The witness, however, added: "They are just little patches; [some very small; some very big.] What I found point a little downward, but they go in the clay. They must come far, because they carry the water in the cellars quite a ways away. I don't know where they end. You just draw that conclusion. It goes around my house; it is high; there can't no water stand there. * * * I have seen other cellars dug in the vicinity of mine, and I have noticed these sand and gravel veins in those cellars. * * * Some may be three or four inches or more; some may be smaller."

On the other hand, the testimony for the defendant tended to show that defendant had made three soundings at or near the northerly line of the cemetery block, one sounding near the center of its westerly line, one sounding near the center of the block, and one sounding near the center of its southerly line; that these soundings were all in the neighborhood of eight feet or more, and in all cases showed a hard, compact clay, a hard pan; while in some places it

seemed harder than in others, no traces of sand or gravel appear. These soundings were made with a three-inch and then with a one-inch auger. Another witness testified that he had examined an excavation for a church recently made in the vicinity of the cemetery, and that a hard body of clay was exposed, but no fissures or seams. It also appeared that in two graves dug in the cemetery no fissures were found. It is evident that this testimony is not particularly significant. Soundings might have been made through the solid clay, and have entirely missed the seams or fissures. Many cellars or graves might have been dug through solid beds of clay. Many other cellars or graves might have encountered the sand or gravel conduits. Equally inconclusive was the testimony of the railroad contractor, who did not remember any sand or gravel in a railroad cut of almost twenty feet. He "was not looking for any."

It was established with equal certainty that water, which the witnesses emphasized was not and could not have been surface water, filled cellars and wells in this immediate neighborhood. The testimony was practically undisputed that water came into cellars every year through these seams. It came into plaintiff's cellar through a hole in the cemented side, and three months later disappeared by evaporation or through the uncemented bottom of the cellar. One witness testified that, in order to take care of that water, many persons bored a hole leading to the outside and placed a pipe to run it from the cellar. It appears quite clearly that wells were supplied from underground water-bearing strata, and at substantially an equal depth, found by the court to be forty feet. The connection with the water in the cellars and wells with the cemetery was certain enough. A seam of sand, surrounded by clay, could conduct water from a grave in the cemetery as directly to plaintiff's cellar or well as could a lead pipe. It is immaterial, however, whether the necessary and inevitable putrefaction about a grave would be conveyed by water directly or indirectly down into the sand or gravel seams to the water-bearing stratum from which the wells are supplied, or by reason of the proximity of two lakes a small distance below the level of the land, the water of which would percolate through the soil to wells or cellars.

The expert testimony, while proper enough, is really not very significant. The secretary of the state board of health expressed an opinion which amounted to this: That if the situation were as described, and the deposit of clay contained veins and seams, then there would be great probability of contamination of wells and cellars, and from a sanitary point of view the proposed location of the cemetery would be highly improper. This was corroborated by other testimony. On the other hand, defendant adduced testimony of an equally eminent expert that this general formation, known as "glacial drift," or "till," not "loess," was practically impervious to water, and that it was an "exceedingly unusual condition" to find such strata through which water can run. This a priori testimony must obviously give way before the actual facts shown. In brief, the experts' opinion amounts to this: That on the assumption that the facts for which the respective counsel contend were true, the conclusion of each would respectively follow. Taken as a whole, such evidence sustained plaintiff's position.

For example, defendant's expert was asked by counsel for plaintiff: "Assuming that, in making excavations north of that cemetery, they struck this formation which has been termed 'till' [by defendant's geologist], and found north of that a stratum of sand, gravel, out of which water oozes and runs, and the same conditions are found the east side of the cemetery, also on the south side; would there be any danger of the contamination of soil by disease germs under those conditions and that formation? A. Yes; there would be. Q. Would you, as a physician, with due regard to the health of the community, recommend the establishment of a cemetery in the location in question? A. No; I should not."

There is no question that the evidence sustains findings of the trial court. There is no doubt and no controversy whatever on that point. The point in the case is that those findings, as interpreted in the light of the evidence, do not sustain the conclusion, but require that a new trial be granted. It is so ordered.

Reversed.

O'BRIEN, J. (dissenting).

I dissent. In my judgment, the findings are not so clearly against the evidence as to require a new trial.

On September 2, 1910, the following opinion was filed:

JAGGARD, J.

In its petition for reargument, defendant regards this court as having "reversed the court below as to the findings of the court below as to a question of fact, notwithstanding there was evidence tending to support the findings of the court below." This is a total misapprehension of the opinion. It was therein expressly set forth that the evidence sustained the findings of fact of the trial court. All members of the court were agreed that the findings were not so clearly against the evidence as to require a new trial, but that the evidence fully sustained the findings of fact. The only question considered was whether those findings, interpreted in the light of the whole evidence, required the granting of a new trial. So far as the record reveals there has been no dissent from the proposition that in this view a new trial was necessary. The court did not finally determine the merits of the case as a matter of law. It merely granted a new trial.

The analysis of the evidence contained in the petition confirms our view previously expressed. Negatively, the defendant is under a misapprehension in this: The burden did not rest on the plaintiff to show to a moral certainty that contamination would necessarily follow from the use of land as a cemetery; the law does not demand the impossible; it was sufficient if she showed a reasonable probability. Therefore the testimony of plaintiff's witnesses was significant, although it was not shown that the testimony expressly "related to digging to a depth not exceeding the depth of stratum twenty or twenty-two feet." Nor was plaintiff required to "establish the fact that the veins of sand are not down through the entire depth of clay strata." Affirmatively: The evidence tends to establish (1) that the clay subsoil was not impervious to moisture, but was permeated by sand and gravel seams extending vertically, horizontally and

obliquely; (2) that neighboring cellars and wells were filled with water which was not and could not have been surface water; (3) that there was a probable connection between the water in the cellars and wells and water which would percolate from graves, although this was of necessity largely inferential.

No dissent from this position by any member of this court has been recorded. Under the circumstances the original opinion must be adhered to, but we desire to make it clear that we have not prejudged the conclusion of law which the court may reach on a second trial.