197 197
203 ²166

# Wahl *v.* Methodist Episcopal Cemetery Association of Williamstown.

*Equity—Injunction—Cemeteries—Pollution of well waters.*

A bill in equity to restrain a cemetery company from the burial of dead bodies in a cemetery, and to remove bodies already buried, on the ground that such bodies contaminated the plaintiff's well, cannot be sustained, where there is no proof whatever that plaintiff's well was in any way polluted and there is affirmative proof that adjacent wells were not contaminated, and also general proof that cemeteries do not necessarily pollute adjacent waters.

*Equity—Injunction—Comparative loss—Cemeteries.*

An injunction will be refused where it appears that the granting of the writ will produce a greater injury than the refusal of it.

A bill in equity against a cemetery company alleging pollution of plaintiff's well, and praying for an injunction to restrain further burials, and to compel the company to remove bodies already buried, will not be sustained where it appears that at a trifling expense plaintiff could connect his premises with pipes of a water company, and that the loss to the cemetery company by such an injunction would amount to a very large sum of money.

Argued May 29, 1900. Appeal, No. 17, May T., 1900, by defendants, from decree of C. P. Dauphin Co., Equity Docket, No. 236, on bill in equity in case of George Wahl and James Staples *v.* Methodist Episcopal Cemetery Association of Williamstown. Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ. Reversed.

Bill in equity for an injunction. Before SIMONTON, P. J.

The facts are fully stated in the opinion of the Supreme Court.

The court below in an opinion by SIMONTON, P. J., entered the following decree :

And now, April 27, 1900, this cause came on to be finally heard on bill, answer and testimony, and was argued by counsel, whereupon upon due consideration it is ordered, adjudged and decreed as follows:

1. That the said, The Methodist Episcopal Cemetery Association, of Williamstown, its officers, agents, servants and employees

be and they are hereby perpetually enjoined and restrained from maintaining the property described in the bill of complaint as a cemetery for burial purpose and from burying or permitting the burial of dead bodies therein.

2. It is further ordered, adjudged and decreed that the said, The Methodist Episcopal Cemetery Association, of Williamstown, J. W. Durbin, J. H. Hoffman, J. W. Stites, Daniel Bowman, John Hay, Samuel Horwell, Henry Maiden, James Blanning, Owen Thomas, Thomas Warlo, Leah Davis, Albert T. Tilley, John Crozier, Mary Jones, Mary Lewis, Wilhelm Books, Charles Woodman, Mary Motter, Charles Badorf, Joseph Graham, John Ashton, Amelia Falkmeyer, George Sharper and David Jenkins, defendants in the said bill of complaint and owners of lots in the said cemetery association, be and they are hereby ordered and directed to remove, from said cemetery, within the period of six months from this date, all dead bodies which they have buried or caused to be buried in the tract or piece of land described in the said bill of complaint.

3. That the costs of the proceeding be paid by the Methodist Episcopal Cemetery Association of Williamstown.

*Error assigned* was the decree of the court.

*Lyman D. Gilbert* and *James C. Durbin*, for appellant.—The defendant, cemetery association, is authorized by its charter to bury the dead in its land, and the doing of it is therefore lawful: Com. v. Reed, 34 Pa. 275; Williams v. New York Central R. R. Co., 18 Barb. 222.

When the landowner without wilfulness or negligence uses his land in the ordinary manner of use, though mischief should thereby be occasioned to his neighbors, he will not be liable for damages: Rylands v. Fletcher, L. R. 3 H. L. 330; Pa. Coal Co. v. Sanderson, 113 Pa. 151.

An injunction will not lie where plaintiff has a full and adequate remedy at law: Hewitt's Appeal, 88 Pa. 55; Shell v. Kemmerer, 2 Pearson, 293; Mulvany v. Kennedy, 26 Pa. 44.

There is only one private person here complaining and the public or commonwealth is not a party to the record. Before the public can be considered it must be regularly on the record: Com. v. Russell, 172 Pa. 506.

The burying of the dead by defendant is not a nuisance per se, as it is authorized by law and its charter: Com. v. Reed, 34 Pa. 275; Williams v. New York Central R. R. Co., 18 Barb. 222; Robb v. Carnegie, 145 Pa. 332.

Complainant could easily supply himself with pure spring water from the water company's pipes, and have better water than the well has ever supplied.

The acts of the defendant cannot be in any sense a nuisance, but if it could be so considered, equity will not enjoin a nuisance if the plaintiff can be compensated by a single suit at law: Reading Iron Works v. Borough of South Chester, 3 Lanc. Law Review, 107; St. James Church v. Arrington, 36 Ala. 546.

*Robert Snodgrass*, with him *F. P. Snodgrass*, for appellee.— If it is a fact that poisonous germs emanating from dead bodies will, under certain conditions, be carried into wells and sources of water supply so as to make their use dangerous to life and health, then we submit that it has been conclusively demonstrated in this case, that such a result will follow the continued use of the property in question as a cemetery: 1 Parke's Manual of Hygiene, p. 27.

In Clark v. Lawrence, 6 Jones's Equity (N. C.), 83, it was held that wherever it can be clearly proven that a place of sepulchre is so situated that the burial of dead bodies will endanger life or health, either by corrupting the surrounding atmosphere or the water of wells or springs, a court will grant injunctive relief.

OPINION BY MR. CHIEF JUSTICE GREEN, July 11, 1900:

The proceeding in this case was a bill in equity to restrain the defendants by injunction from maintaining a cemetery property for burial purposes and from burying or permitting the burial of dead bodies therein, and from polluting and contaminating the wells of the plaintiffs and other persons residing in the borough of Williamstown and township of Williams. And also that the defendants be required to remove dead bodies which had been buried in the cemetery ground in question. The averments in the bill are that the cemetery ground slopes toward the land of the plaintiffs, that the wells of the plaintiffs are supplied with water from springs and underground streams

which flow under the cemetery ground, and that by reason of the formation of the soil the natural drainage of the land is in the direction of the plaintiffs' lands.   That the location of the cemetery, and the burying of dead bodies therein will contaminate the wells of the plaintiffs and others residing in the vicinity, and will thus render the waters of the wells unfit and dangerous for drinking and other domestic purposes, will engender disease and imperil the lives and health of the plaintiffs and their families and others using the water, and will render valueless the properties of the plaintiffs, and so cause them irreparable damages for which they have no remedy at law.

The answer of the defendants denies all the material averments of the bill, and alleges that the rock underlying the surface of the cemetery ground dips away from the land and wells of the plaintiffs so that the percolating water from the surface, if there were any, could not possibly reach the wells of the plaintiffs, and that the surface water could not escape on the lands of the plaintiffs by reason of a lane between the cemetery and the land of Staples and a ditch diverting it from the land of Wahl.   The answer further denies that there has been or could be any pollution of the water of the wells of the plaintiffs or either of them, and avers that the burial of dead bodies in the cemetery would not pollute or contaminate the water of the plaintiffs' wells, nor render it unfit for drinking, or other domestic purposes, nor would it engender disease nor impair the lives or health of complainants and their families or others using the water, or render valueless the property of the plaintiffs, or cause them damage.   And the answer further avers that the location is the only suitable one that could be found without going many miles away from the town, that it is in a sparsely inhabited locality, about three fourths of a mile from the built up portion of the town, that the surface slopes towards the creek away from the property of the plaintiffs, and that the underground water drains away from the plaintiffs' lands and houses and that the nature of the soil is such that no unhealthy germs could pass through six feet of the same.

These pleadings raised mainly questions of fact which involved the contention whether the water of the plaintiffs' wells was contaminated by water discharging from the cemetery ground both on and under the surface.

The case was heard upon testimony delivered before the court below, and resulted in a final decree awarding the injunction as prayed for and from this decree the present appeal is taken.

After a most thorough and minute study of the whole of the testimony on the record we find ourselves unable to agree with the conclusion reached by the learned court below and we are therefore obliged to reverse the decree, for reasons which we will now proceed to indicate.

The first and one of the most important considerations which affects our judgment, is the fact that, although the chief complaint of the plaintiffs is the pollution and contamination of the water of their wells, there is not a solitary particle of testimony in the whole record showing any pollution or contamination of any of the water of either plaintiff's well, or of any water flowing upon or under their lands from the defendant's cemetery ground. Not a witness was examined who testified to any pollution or contamination of any of the water on the plaintiffs' lands or wells. Not a witness said that the water had any disagreeable smell or taste, or that it was in any respect affected or changed from its former condition. The plaintiff Wahl and his son were both examined as witnesses for the plaintiffs, and neither of them uttered a single word showing that the water was affected in any degree whatever. Although dead bodies had been buried in the cemetery for nearly two years before the bill was filed, which was in May, 1897, and the testimony was not taken until January, 1899, and at that time Henry Wahl, the son of one of the plaintiffs, testified that seventy-nine bodies had been interred in the cemetery, some of which were close to the line of Wahl's land and less than 100 feet from his well yet neither that, nor any other witness testified that there was the least pollution of the water of the well. It seems extraordinary that this should be the condition of the testimony, when the very substance and matter of the controversy was the pollution of this very water. And it is still more extraordinary when it is considered that the plaintiff, Wahl, proved by the testimony of his witness, Dr. Hamilton, that dead bodies commence almost immediately after interment to cast off disease germs which will be carried off by percolating water. He was asked: " Q. Doctor are you able to say from your knowledge and study and experience how long after a body has been buried

it will be liable to cast off through percolation of water disease germs? A. Almost immediately, a few hours. Q. Immediately after death? A. Immediately after death; there are several of the putrefaction changes take place after death that are of such a character soon after death as to be very highly poisonous, subsequently, they assume a more permanent character and are not quite so poisonous .... subsequently they take a more permanent form and pass as albuminoids and be carried along by water supplies or by any other way and have sometimes poisoned animals. Q. How long would that condition continue with respect to a dead body; I mean the liability to carry disease germs into the soil? A. I suppose it would be any where from five to ten years."

Dr. Hamilton also testified that he placed some lithia in a hole in the bottom of a grave freshly dug at a distance of about 200 feet from the well and afterwards made another hole in another place and put lithia in it, and in seventy-three hours after he found lithia in the well. In view of this testimony it is difficult to understand why there was no testimony to prove actual pollution of the water of the well by emanations from dead bodies. We cannot but regard this defect in the proof as fatal to the claim of the plaintiff that there was any real pollution of the water from this source.

But there was testimony of a very positive and affirmative character that this theory of pollution had no foundation in fact. Mrs. Pauline Vottler testified for the defendant; "I live right on the upper side of the grave-yard, the nearest one to it. Q. When did you purchase there? A. I bought a piece of land of Mr. Staples that time. Q. When did you build there? A. This year. Q. Since the cemetery is there? A. Yes, sir; he said he was going to have that put away. Q. Does it hurt you any way? A. Not at all, I don't see any damage. Q. Where do you get your water? A. Sometimes I get it at Staples; I did'nt have any well yet. Q. Is the water as good now as it was before? A. Why better. Q. That is to say, it is better than when the ground was plowed? A. Yes, sir. Q. It used to be cultivated; they used to plow that field? A. Yes, sir. Q. The reason you say the water is better now is because it does not get as muddy now? A. No, sir. Q. The cemetery has kept it clear? A. Yes, sir, purified it. Q. Where is your

house?   A.  Right the upper side of the grave-yard; I am on the same side as Staples, only a little further up."

Another witness, Mrs. Sarah Challenger, testified as follows: " Q. Where do you reside?   A. Next lot to Mr. Staples. Q. Have you a well?   A. Yes, sir, I have a well. . . . Q. There are a number of persons buried in that cemetery?  A. Yes, sir. Q. Has it had any deleterious or bad effect?   A. No, sir, it has not.  Q. No effect at all?   A. No sir, not, whatever.  Q. Has it in your estimation injured any water in the wells or anything of that kind?  A. No, sir, it has not.   Q. What effect has it upon the value of the land, if any?   A. It has not in mine. Q. You live next door?   A. I am the next block, and the six lots opposite is mine, opposite the grave-yard, opposite Mr. Staples.   Q. You could get just as much now as before the cemetery was there?   A. I should think I would; I wouldn't give them for any less, I would want more.  It is more pleasant now than it ever was.   Q. Will it be still more pleasant when the trees are planted?   A. Yes, sir, it will for the folks to come out."

Now Dr. Hamilton testified that when he experimented in the bottom of the grave he put down two holes, one pointing towards Mr. Staples's well and the other pointing towards Mr. Wahl's well, and into each he put some bromide of lithium and a little distilled water, and then watched the wells for effects. He was asked: " Q. Did you find any traces of lithia in the wells afterwards?   A. I found some traces of lithia in Mr. Staples's well.  Q. Find any in the well of Mr. Wahl that time?   A. No, sir."   He further testified that afterwards, on the 29th of July, after a rain, he found the lithia in Wahl's well, but that was from another hole in another place.   It would seem, therefore, that although the same testimony that proved the presence of lithia in the well of Wahl proved it in the Staples well, but as to the water of the Wahl well there was no proof that it was ever contaminated, and as to the water of the Staples well there was positive proof by a person who used it that it was never contaminated, and by another witness who owned and used a well close to the Staples well that its water was never contaminated, but on the contrary it was just as good as it ever was before the cemetery was established.

But this is not all.   It was testified by the plaintiff Wahl,

that there were several other wells in near proximity to the cemetery belonging to different persons, and it is the fact that not one of those persons was produced to testify that the water in any of their wells was ever polluted or affected in any degree whatever. It cannot be supposed that if the water of their wells was affected the proof of that fact would have been withheld. In fact the absence of such testimony is highly pursuasive proof that the water coming from the cemetery either on or below the surface, did not in point of fact in any degree contaminate the water of their wells.

But in addition to the foregoing there was other and highly important evidence by a very intelligent and entirely disinterested witness, who spoke from actual experience, and whose testimony was an absolute challenge of the whole theory upon which the plaintiffs' contention was founded. The witness was the Rev. Samuel Hornell, who was asked: " Q. Have you ever lived near cemeteries in districts that have been populated? A. I have, in Philadelphia. Q. Near what cemetery? A. I have lived adjoining the cemetery in the 35th ward, close to it. Q. Any wells in that neighborhood? A. Yes, sir, we had a well adjoining the cemetery ground, and the cemetery had been there for seventy-five years, and we had no difficulty whatever in the water; we considered it the best water in the country; in addition to that there were three other wells right on the cemetery ground, and there was another well on the public school ground, and the water is always good. Q. Was it used by the children and the people? A. It was used by the families residing in the house adjoining the cemetery ground, and it was used by the public school children. Q. How many people so far as you could judge had been buried in that cemetery, how many graves were there? A. I could not tell. Q. As near as you could judge within a few hundred? A. Oh, well, I couldn't form any idea, it has been over seventy years. Q. There were thousands there, were there? A. No, I should suppose not more than a thousand. Q. There were there then in the neighborhood of a thousand? A. I couldn't say that. Q. There were many hundred? A. Oh, yes, must be. Q. And you never heard of any sickness or other bad effect from the drinking of the water of the wells? A. Not at all. Q. Immediately in the neighborhood of and in the cemetery? A. Not any. Q. From your

knowledge thus acquired what is your opinion as to the effect of the cemetery upon the wells in the neighborhood in this instance? A. I should think it would be utterly impossible to affect the wells in any respect. I have known a well in Greenwood cemetery in Brooklyn, where there are 300,000 buried, and I have had water at that well in the cemetery; the well has been there for years. Q. Visitors go to the cemetery? A. Yes, sir, drinking of the water in a cemetery of 300,000 dead. Q. And no person to your knowledge ever complained? A. Never heard any complaint of the water." On cross-examination he was asked: "Q. What do you say then about a well being in a graveyard, is it conducive to health or injurious? A. I do not consider it has anything to do with health. Q. Then in your opinion, as you have evidently given the testimony as an expert, in your opinion, it is not injurious to a well to have it near a cemetery? A. I have not known any injurious effects from wells close to cemeteries."

Another witness for defendant, Dr. Sites, after having testified that he was a practicing physician since 1882, a graduate of the College of Physicians and Surgeons and a post graduate of Jefferson Medical College, and further that he was well acquainted with all the cemeteries in Williamstown, including this one, that he was a member of the board of health of the borough, and had made a special study of the subject of cemeteries and their liability to contaminate adjacent wells and springs, was asked; "Q. You stated your position and practice since 1882. A. Yes, sir. Q. Member of the board of health of the borough of Williamstown? A. Yes, sir. Q. Acquainted with the location of this property and the adjoining properties? A. Yes, sir. Q. State what effect, if any, would the burial of bodies in this property in the manner you have stated, have upon the wells of Mr. Staples and Mr. Wahl. A. I don't think it would have any effect."

Notwithstanding the manifest effect of the foregoing testimony was to impugn and question the theory, that the interment of bodies in this cemetery would necessarily tend to contaminate the water in the wells of the plaintiffs, no contradictory or countervailing testimony was introduced, and as the record now stands the positive testimony of witnesses who have used the water, and the opinions of competent disinterested

witnesses having experience, and having made a study of the subject, remains without contradiction or dispute, and no contrary experience has been given in evidence.     But in addition to all this, it is the fact that no test of the water of either of the wells was ever made, to show whether it had been contaminated with any deleterious matter coming from the cemetery grounds.     And the case as it now appears upon the testimony, is absolutely destitute of any evidence to show the least degree of pollution of either of these wells, or of any neighboring wells, although in 1899 interments had been proceeding for fully four years.     It is strange that while a test was made to discover the presence of lithia which had been placed in holes on the cemetery grounds, no test was ever made, or even attempted, to show whether the well water was contaminated by any unwholesome emanations from the cemetery.     In regard to the lithia test, it was certainly neither conclusive nor satisfactory. Aside from the circumstance that the lithia found in the well might easily have been placed there, it proves nothing as to whether there were any unhealthy percolations from the cemetery grounds, and yet that was the one supreme, vital fact necessary to be established, not by theory or inference, but by testimony as a distinct fact.     Yet there was no proof in the cause that there were any such percolations at this cemetery. There are many thousands of cemeteries scattered all over our country.     If it is the fact that all cemeteries pollute the adjacent waters it would be a very easy matter to prove it, but in this case there was no such proof, not only as to this cemetery, but as to any cemeteries anywhere.     It may even be conceded that where cemeteries are overcrowded with dead bodies such a result would follow, but in the vast majority of cemeteries there is no such overcrowding, and in the present case it is scarcely possible to conceive that such a condition will ever transpire. But for the purposes of the present litigation it is only necessary to know that there is no such proof on this record.     This proceeding is aimed at the very existence of this cemetery, and it has actually resulted in a decree which destroys it utterly. While there might possibly be such a condition of things in a given case as would justify such a decree, it is too plain for argument that before such a decree can be sustained, the condition which would warrant it must be established as a fact.     It

is not enough to show that such a result might take place in the future, it will not do to rest only upon inferences and theories, there must be actual proof by testimony not doubtful, either that all cemeteries do naturally and necessarily pollute the adjacent waters, or else that in this particular case such pollution has actually taken place. But neither of these propositions has been proved by any testimony necessary to support it. But on the other hand there is positive testimony, already quoted, showing first that cemeteries do not necessarily pollute the adjacent waters, and second, that the adjacent waters in this case are not polluted. On the merits, therefore, of the present contention, we are clearly of opinion that there is no sufficient proof to sustain the allegations of the bill.

There is no better illustration of the propriety of this conclusion than is found in the testimony of the principal witness for the plaintiffs, Dr. Hamilton. He was interrogated as to his opinion upon the question of contamination of the wells from the burial of dead bodies in this cemetery. " Q. What would be the natural effect then upon Mr. Wahl's and Mr. Staples's wells, and other wells adjoining there, resulting from a large number of dead bodies in that soil ? A. The result would be, as the bodies increased, the reservoir of water supply would become contaminated. Q. It is said there are seventy-nine bodies buried there now and that has been within the last three years perhaps, would that number of bodies have any effect in your judgment? A. Well, some bodies, any body would have an effect, more bodies would have a greater effect, and a very large number of bodies would probably have a deleterious effect. . . . Q. Does or does not the burial of a dead body eliminate the dangerous germs that emanate from diseases ? A. No sir; not so much as if it was allowed to be out in the sunlight. Q. Would such germs in your judgment find, taking into consideration the conditions as you find them, naturally find their way into this well ? A. As one of the sources of supply. Q. What effect would that have upon the health or the lives of people using the water? A. It would ultimately prove to be harmful to the health. Q. Would it be dangerous ? A. Yes, sir ; it might be dangerous, it might only be harmful, or it might create death."

This is the strongest expression of opinion that could be ob-

tained from the chief witness for the plaintiff, and it amounts to just this, that in the opinion of the witness, it was all a matter of opinion only, if there were a very large number of bodies interred in this cemetery it might have or would probably have a deleterious effect. And if the germs should find their way into the wells of the plaintiffs it might be dangerous, and it might only be harmful, or it might create death. That is, a possibility in the event of a very large number of interments, that the germs from the bodies if they reached the wells, might be harmful or dangerous or might produce death. What was meant by "a very large number of bodies" was not defined, but as there is no probability that in a small town like this, there would ever be a very large number of interments, the supposed possible resulting event of pollution might never occur. As a matter of course such a contingency as this, even if it were undisputed, could not possibly support a peremptory and mandatory injunction as was decreed in this case.

A great deal of testimony was taken in regard to the character of the soil, the inclination of the surface and the dip of the underlying rock, the purpose being, on the part of the plaintiffs, to show that both the surface water and the subterranean water tended to flow more particularly, to the land of the plaintiff Wahl, and on the part of the defendant, to show that the tendency of both waters was to flow away from the land of the plaintiffs, particularly that of Wahl. The witnesses for the plaintiffs claimed that the surface water flowed towards Wahl's land because the surface of the ground sloped in that direction, and that one of the underground streams which fed Wahl's well came from under the cemetery ground. The witnesses for the defendant testified that the surface water could not reach Wahl's land because of a drain made on the inside of the cemetery wall which carried it off in another direction, and as to the underground water, it necessarily followed the course of the underlying rock, which dipped toward the north, and away from the land of both plaintiffs, especially Wahl's. It is not necessary to review this testimony or to decide what were the real facts as to this part of the controversy. The evidence was very contradictory and not reconcilable, and the preponderance of it was with the defendants. But it is not of sufficient consequence to spend time upon it, because of the fatal defect in the plaintiffs'

testimony as to there being any actual polluting flowage of any kind to the plaintiffs' lands or wells, or any polluted water anywhere on or under the cemetery grounds. This subject has been already fully considered and discussed, and in the view that we take of the testimony the case fails for want of proof on this subject.

It remains only to consider very briefly the authorities as to the facts which must be found to exist in this class of cases before an injunction will be awarded. The object of the proceeding is to prevent the defendants from fouling the water in the plaintiffs' wells. That is an injury for which the ordinary remedy is an action at law to recover damages, and it is an adequate remedy in all usual cases. There is no special injury alleged or proved, other than the possible fouling of the plaintiff's well water, and for that, while it would be a serious inconvenience, there is a very simple remedy by taking water from the pipes with which the town is supplied. The cost of this supply would be a mere trifle, and hence it cannot be said that the injury to the plaintiffs is in any sense irreparable. When it is considered that the enforcement of the decree made by the learned court below will require the total destruction of the cemetery property, and the removal of nearly 100 dead bodies to some other place at a very heavy cost, and that the refusal of the decree will not necessarily result in any more serious consequence than the expenditure of a few dollars a year by the plaintiff, to obtain a full supply of pure water for domestic use, the contrast of the injury caused by the granting of the decree, with the injury resulting from its refusal is so very great that it may well be contended, that the case is brought within the line of decisions in which the remedy by injunction is refused, where it appears that the granting of the writ will produce a greater injury than its refusal. In Richards's Appeal, 57 Pa. 105, it was said, THOMPSON, C. J.: "An error seems somewhat prevalent in portions at least of this commonwealth, in regard to proceedings in equity to restrain the commission of nuisances. It seems to be supposed that, as at law, whenever a case is made out of wrongful acts on the one side and consequent injury on the other, a decree to restrain the act complained of, must as certainly follow, as a judgment would follow a verdict in a common-law court. This is a mistake. It is elementary

law, that in equity a decree is never of right as a judgment at law is, but of grace. Hence the chancellor will consider whether he would not do a greater injury by enjoining, than would result from refusing, and leaving the party to his redress at the hands of a court and jury. If in conscience the former should appear he will refuse to enjoin." In Dilworth's Appeal, 91 Pa. 247, we said, " It often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law." In Rhodes v. Dunbar, 57 Pa. 274, we said, " That a thing may possibly work injury to somebody is no ground for injunction. If the injury be doubtful, eventual or contingent equity will not interfere by injunction."

In the first of these cases the injury complained of was actual, long continued and very severe. It consisted of pollution of the air which was blown upon the plaintiff's dwelling house and premises from the iron works of the defendant, rendering his residence uncomfortable and unwholesome, injuring and discoloring the fabrics manufactured in his factory and causing the deterioration of his machinery. Speaking of this, Chief Justice THOMPSON said in the opinion : " The plaintiff's dwelling, it appears, is situated on a bluff or hill northwardly from the defendant's works about seventy feet above the nearest furnace floor, which brings its first story about on a level with the top of the puddling stacks, and when the wind is towards the plaintiff's house and from the furnace, the consequence is that it is at times enveloped in a coal smoke thrown out of the chimneys of the puddling furnaces. It cannot be doubted, I think, that this materially operates to injure the dwelling house as a dwelling, and consequently to deteriorate its value. The alleged injury to the factory is mainly that the smoke and soot of the furnace blackens the stock and renders the fabrics less salable. This I can readily understand and believe. . . . Still there may be injury to the plaintiff, but this of itself may not entitle him to the remedy he seeks. It may not if ever so clearly established, be a case in which equity ought to enjoin the defendants in the use of a material so necessary to the successful production of an article of such prime necessity as good iron, especially if it be very certain that a greater injury would ensue by enjoining than would result from a refusal to enjoin."

It is at once apparent that there was a far better and stronger right to a preventive remedy in the case just cited than in the case at bar, and yet an injunction was refused and the plaintiff was turned over to his remedy at law. In the present case, as we have heretofore shown, it was not even established that there ever was any actual injury sustained, and on the testimony of all the witnesses, it is very doubtful, to say the least, whether there ever will, or can be, any injury such as is alleged. Upon the doubtful character of the claim alone, it is clear that no injunction should be granted, but that the plaintiff should first be required to establish his right to recover at all by an action at law. It is not necessary to cite the well known authorities which establish this perfectly familiar rule. The case of Evans v. Reading Chemical Fertilizing Co., 160 Pa. 209, upon which the decree of the court below was founded, is not at all applicable as the facts there were totally different, were without substantial dispute, and the nuisance in question was a very gross nuisance per se and not at all necessary in the neighborhood where it was conducted. Without pursuing the discussion further we are clearly of opinion that in a case of this kind, where the cemetery in question was a matter of public necessity, considering that it was carefully and judiciously located outside the town, in a very sparsely populated district, that it was fully proved that no other suitable place could be procured except at a distance of several miles from the town, that it will be very many years before the ground will be occupied by numerous bodies, and above all that no actual injury of the kind complained of has been shown by the testimony, and that it is very doubtful upon all the testimony whether any such injury ever will occur, and that if, and when, it does occur this plaintiff will have an ample remedy at law, the remedy by injunction ought not to be allowed. We therefore feel obliged to sustain the assignments of error and reverse the decree of the learned court below.

It is proper to say that the plaintiff Staples having died pending the proceedings, his heirs were unwilling to continue in the case and retired therefrom, and thereafter the plaintiff Wahl proceeded with the case alone.

Decree reversed and bill dismissed at the cost of the appellee.