.E. A. REID, et al. v. MEMPHIS MEMORIAL PARK.

Western Section. April 14, 1927.

Petition for Certiorari overruled by Supreme Court, July 15, 1927.

1. **Injunction. Nuisances. Injunction will not lie to prevent one from establishing a cemetery where no actual damage is shown.**

   In an action to enjoin the defendant from establishing a cemetery where it was alleged that plaintiff's wells would be polluted, and the evidence showed that the soil was such that the wells would not be affected, held that the action of injunction would not lie.

2. **Cemeteries. Nuisances. A cemetery is not a nuisance per se.**

   A cemetery is not a nuisance per se and ordinarily courts of equity will not interfere with the establishment of a cemetery unless it is shown that the party complaining will receive actual injury.

3. **Cemeteries. One establishing a cemetery is not liable for damages caused by depreciation of adjoining property owners' land.**

   Cemeteries are necessary and therefore one establishing a cemetery is not liable for damages to adjoining landowners, because of the depreciation of the value of their land, simply because people do not care to live near cemeteries.

Appeal in Error from Chancery Court, Shelby County; Hon. M. C. Ketchum, Chancellor.

Affirmed and bill dismissed.

G. E. Neuhardt & A. C. Muir, of Memphis, for appellant.

Siveley, Evans & McCadden, F. M. Gilliland, of Memphis, for appellee.

OWEN, J. Complainants have appealed from a decree rendered in the lower court dismissing their bill and refusing them relief.

The complainants are owners of real estate in Shelby county, and are E. A. Reid and wife, M. F. Reid, A. W. Burdick, John Haumes, D. J. Tyre and C. H. Poland. The defendant Memorial Park Association is a corporation chartered under the laws of Tennessee, engaged in the business of conducting and maintaining a cemetery in Shelby county. The other defendant is E. C. Hinds, the president of the defendant corporation.

Complainants own real estate adjacent to the tract of 54-1/4 acres of land that is owned by the defendant corporation, all in the vicinity of where the cemetery tract is located. Complainants allege, in substance, that the said cemetery will become a private nuisance, endangering the health and lives of the owners of said property by contaminating the well water used by them through germs coming from dead bodies. That the establishment of said cemetery is in violation of the "Cemetery Act of Tennessee of 1925." Also seeking to recover damages caused by the location of the said cemetery in depreciating the market, rental and sale value of the complainants' said property. The bill was filed April 17, 1925 for the purpose of enjoining the defendants from further operating a park type cemetery which had been dedicated and established about August, 1924. This cemetery tract is five and one-half miles east of the eastern limits of the City of Memphis. The bill alleged that the soil of the cemetery tract was porous and that surface water would seep through the same, and that germs from the bodies buried in said cemetery would be carried by said surface water into and pollute the wells of the complainants' lands. A temporary injunction was granted upon execution of bond. Defendants filed a demurrer as to that part of the bill relying upon the Cemetery Act passed one week prior to the filing of a complainants' bill, the ground of the demurrer being that the cemetery was established and dedicated prior to the passage of said act, and that the Cemetery Act could not affect a cemetery established and dedicated prior to its passage; and the defendants further demurred on the ground that the Cemetery Act was unconstitutional.

The defendants answered the other allegations, denying that the wells of complainant would be polluted from the surface water and denying that complainants were entitled to recover any damages, or that any damage had been done to complainants by the location and establishment of said cemetery. The answer averred that defendant had paid $34,000 for the land; that the land was purchased by E. C. Hinds in August 1924, and later during the year 1924 conveyed to the defendant corporation, Hinds becoming president. It averred that it had sold 260 burial lots at the time of the filing of its answer on June 5, 1925, and that it had expended more than $76,000 in beautifying and improving said cemetery at the time of the filing of the answer. To the answer is exhibited a copy of the blue print of the said cemetery showing the lots, walks and driveways; also designating the lots that had been sold. This blue print showed the location of complainant's property and the distances therefrom to the cemetery tract, together with the depth and location of complainants' wells. It further exhibited to said answer a picture or drawing of the park type cemetery as it will appear when completed. Some-

time after the answer was filed the temporary injunction was dissolved upon the defendants executing a bond in the sum of $15,000.

Numerous depositions were taken and a large record is presented to us, consisting of four volumes. The record was submitted below to Chancellor Ketchum who, as stated, dismissed complainants' bill and and denied any relief. The chancellor filed a written opinion of more than twenty-five pages setting out fully the facts as he found them from the record as submitted by the depositions of the various witnesses and also excerpts from numerous opinions delivered by various supreme courts of this country. The complainants filed a petition to rehear, this was denied. They prayed and were granted an appeal to this court, perfected the same, and have assigned four errors.

The first is, the court erred in denying the injunctive relief sought. The second error complains of the court's holding that the Cemetery Act of 1925 only applies to Shelby county had no application to this cause. The third error is that the court erred in holding that the complainants were not entitled to damages for the depreciation of the value of their respective properties by reason of the establishment of the cemetery and in failing to refer this part of the cause to the Clerk and Master to ascertain such damages as to each piece of property. The fourth error is, "the court erred in discharging defendants and their surety from all liability on the $15,000 bond which was executed as a condition for the dissolution of the temporary injunction.

The cemetery in question fronts south on Poplar Pike; it fronts west on Yates Avenue. The complainants Reid and wife own five acres of land adjoining the cemetery on the north. The complainant Poland owns twenty-five acres adjoining the cemetery on the east, and Poland's land extends north and to Reid's north line. That is to say, Reid's lands lies north of the cemetery and west of Poland's land.

We should have stated at the outset that this case was ably argued by both sides when it was presented to the court during this term. Nothing has been left undone; the court has been greatly helped by the argument of counsel for contending parties and by the splendid and elaborate briefs from each side.

Much of the testimony as found in the transcript is from expert witnesses. Numerous witnesses were called upon to give scientific opinions, and they gave evidence both for and against the theory that the burial of bodies in the defendant's cemetery would pollute the water in complainants' wells. Complainants Reid and wife live on their tract of land. Complainant Poland has a very fine home erected upon his tract. The expert witnesses are men of national reputation and stand high in their profession as geologists and bacteriologists.

During the summer of 1925 the attention of the defendant E. C. Hinds was drawn to the new type of cemetery, known as the ''Park Type,'' which character of cemetery was being established in many of the large cities of this country. It appears that the park type cemetery had been established in more than fifty cities in the United States. The defendant Hines made trips to St. Louis, Kansas City, Chattanooga, Atlanta and Shreveport, and examined the park type cemetery located in those cities. Having concluded to establish a park type cemetery in Shelby county, the defendant undertook to do so in a scientific way, as had been done in other cities. He employed a landscape architect and engineer in the person of Mr. John Noyes who was the landscape architect and engineer for the noted Missouri Botanical Gardens, called sometimes Shaws Gardens, near the city of St. Louis, which gardens have a national reputation. Mr. Noyes testified. He had been the architect for some eighteen or twenty park type cemeteries in this country. Mr. Noyes advised Mr. Hinds, after looking over a number of tracts which Hinds thought that he could purchase in Shelby county that the tract of land that was later purchased by Hinds and adjoining the complainants' Reid and Poland's home tracts was the most suitable for a cemetery, taking into consideration the character of the soil, in that it was not porous; the drainage with respect to the surrounding land; the location with reference to there being but few homes in the vicinity, and yet sufficiently near the center of population as to be accessible; also the topography of the site; its adaptability for beautification. It appears that the cemetery tract is so situated that the water from the adjoining landowners drains on to it, and that it possesses a natural drain near its northern portion that takes care of all drainage.

After receiving the report of Mr. Noyes, Mr. Hinds purchased the 54-1/4 acres of land and employed the Morgan Engineering Company to lay out and construct the cemetery. This engineering company's work consisted of building driveways and walks, and subdividing the remainder into lots. Noyes' report called for a twenty-five foot strip all around the cemetery, and just inside of its boundary lines, to be planted in shrubbery of sufficient height so that people passing on the pike or avenue would not see inside of the cemetery. It appears from this record that burial grounds have had their evolution as well as other things, in the history and progress of the world. We find that people construct houses differently from those lived in a few centuries ago, and it is said that in the early days of burial grounds we had the family burial plot, a small place set aside on the farm or plantation and devoted to the burial of deceased members of the family, and as the old folks died and the children moved away the farm passed into the hands of strangers, and the burial ground was neglected.

The first burial ground of which the writer of this opinion has knowledge, as far as history records, was the field with the cave thereon purchased by Abraham from Ephron, the Hittite. (Genesis 23:15, 20.) Three generations were buried in that field or the cave in the field. Later we are told that Moses, the great Law-Giver, was buried in a valley in the Land of Moab over against Beth-peor, but his grave was lonely and unmarked (Deut. 34:6). Then came the community burial ground. It was usually connected with a country or village church. Our changing population caused it to become neglected. The pioneers passed away and the community filled with new people. These community graveyards were ill-kept, usually designated by the growing of a few cedar trees and some weeping willows which gave them a desolate and sad appearance. Through a desire to better perpetuate the memory of the dead, and take care of their final resting place, there later developed the municipal cemetery,—more attractive in outward appearance than the old country graveyard, but this too suffered neglect.

The defendant undertook to create and dedicate the most modern cemetery. One-fourth of the funds received from the sale of lots was to be an endowment fund, a reputable bank of the City of Memphis, and its successors, was made trustees for this endowment fund for the perpetual care of this park cemetery. This cemetery or memorial park carries a restriction prohibiting the erection of tombstones of any kind. The purpose is to get away from those things which in the old-fashioned burial ground tend to create an atmosphere of sadness and depression, and in place thereof substitute the things that are suggestive of life rather than death,—such as flowers and shrubbery, beautiful drives, lakes and fountains, and those things that divert the mind from the thought of death, and to that of life. All graves are to be marked exactly alike, with a small green granite marker, a few inches in size laid flat on the ground, so that the lawn mower will pass over it. To all outward appearances, the Memorial Park will be free from all the depressing atmosphere of the old-fashioned cemetery.

The complainants' water supply is from wells on their several tracts of land. Some of these are shallow wells; others are deep. Reid's well is eighty to eighty-five feet deep and is about one hundred feet from the cemetery line. Poland's well is two hundred and seventy-two feet deep, and is about two hundred and fifty feet from the cemetery line. Tyre's well is about two hundred feet deep, and is about six hundred feet west of the southwest corner of the cemetery property; Burdick's well is two hundred and thirty-seven feet deep, and fifteen hundred feet west of the southwest corner of the cemetery property. There are a few other wells in the neighborhood varying

in depth from sixty feet to two hundred and fifty feet. The shallow wells, those less than one hundred feet in depth are encased in in six inch tile tubing cemented at the joints; and the deep wells are encased with four inch iron pipe.

The testimony of several expert witnesses was taken for the purpose of showing the character of the soil underlying the park property and vicinity; these witnesses are geologists and scientists of national reputation, and they give their reasons for their opinions: their veracity can not be questioned, yet they differ widely in their conclusions. The witnesses in behalf of the complainants, testify that the underlying soil is what is geologically known as loess, very porous and freely water-bearing; while the witnesses for the defendants say that it is dry, red clay, geologically classified as loess, but compact and practically impervious to water.

The complainants introduced Dr. L. C. Glenn, professor of geology at Vanderbilt University, and one of the leading geologists in the south. Dr. Glenn was of the opinion that there would be a chance of contamination from germs coming from bodies buried in defendant's cemetery to all the water coming from wells within a half mile of the Memphis Memorial Park. He was of opinion that the greater danger was in surface or shallow wells. He testified that geologists differed in their conclusions based upon the same facts. He made no examination of the soil at or near the Memphis Memorial Park. His testimony was based upon his knowledge of conditions existing in that region, but he testified that he was familiar with the area or lands within the region where the defendant's park is located.

E. B. Bird, a mining engineer and geologist, of Little Rock, Arkansas, made what he termed a geological survey of the lands adjoining the cemetery. This witness made shallow borings to ascertain the character of the soil. He gave it as his opinion that the shallow wells within a half mile to the north of the cemetery would be polluted, but that the deep wells of Poland and two of the other complainants whose lands were further removed from the cemetery and not adjacent thereto, would not be affected, and certainly not until burials were made in sections of the cemetery nearest their wells. Complainant also introduced Dr. Louis Leroy, a well known bacteriologist of Memphis, and other experts, who testified in their opinion that the wells would become polluted. One of complainants' expert witnesses testified, in his opinion, if cement was placed around the pipes that entered these wells, this would prevent any seepage from getting into the water in the well.

It appears that all the wells of the various complainants are lined with iron pipes, except Reids' well, his having terra cotta, and the witnesses for complainants testified that water down to a certain point would likely seep through the pipe in the well where there were

joints. Complainants also introduced a number of witnesses engaged in real estate business, who testified that complainants' property, by reason of no one wanting to live near a cemetery, was damaged from twenty-five per cent. to fifty per cent. The complainants all testified to the same effect, but it appears that complainant Poland was asked by a representative of the defendants to put a price upon his property after this litigation was instituted, and he responded by asking the sum of $50,000. His property had cost him less than $40,000.

The defendants introduced as expert witnesses M. Z. Bair, Sanitary Engineer with the Arkansas State Board of Health, Dr. W. M. Tucker, Hydrologist of the State of Indiana and Dr. F. A. Mantel, Chief Chemist and Bacteriologist for the City of Memphis. It appears that these witnesses are all highly educated in the science of geology, chemistry and bacteriology. Bair and Tucker made certain tests by digging holes in the north end of defendant's property. Water was placed in these holes, which were about 12 to 13-1/2 feet deep, and in the water was placed a solution of sodium chloride and a solution of flouresoine. Flouresoine is a very strong coloring agent and will stand enormous dilution. The hole being filled with these two constitutents,—there were two tests, one a chemical test which could be made to identify the salt; the other a physical test, which was one of simply observing the presence or absence of color caused by flouresoine. The two holes were five feet apart. The liquid was left in the hole for a period of something like ten days. There was no seepage found from the westerly hole, which was filled, to the easterly hole. This witness testified that the red clay which he found some few feet below the surface was practically impervious, and that beneath the park site the soil contains an unusual amount of clay, which renders it practically impervious.

The witness Tucker, who is the author of a standard work on hydrology also made tests similar to those made by the witness Bair, and he testified that the soil was impervious about two feet below the surface. He also made another experiment, taking a small handful of mud or clay which had been gotten at a depth of ten feet from a hole dug to a depth of about twenty feet; he wet this clay, put it in a funnel eight inches in diameter; he sprinkled over this wet clay a lot of dry clay of the same kind, filled the funnel with water and put it over a glass. After three hours not a drop of water had gone through to the glass. This witness states positively from his knowledge of this character of clay, as well as from the two experiments, that the soil is impervious and that the water that will pass through it is absolutely negligible. He testified it would be impossible for water from the cemetery to seep into the Reid well, which is the

nearest well to the park. Dr. Mantell testified that, in his opinion there would be no seepage flowing from the graves in the park to neighboring wells.

In addition to these expert witnesses, the defendants introduced witnesses of standing in the community who lived near Forest Hill Cemetery. Some of them had lived just across the Hernando Road from the Forest Hill Cemetery, which is a large cemetery southeast of the city of Memphis. The witnesses use water out of shallow wells. Some had lived in their present homes for twelve years, and had used well water during this time and had found no contamination. One witness, C. B. Burns, lived within five hundred feet of Forest Hill Cemetery. His family consisted of a wife and eight children, and he had lived in his home for thirteen years when he gave his deposition. His children were from four to eighteen years of age. His water supply came from a shallow well, sixty feet in depth. This witness had never found any impurity in his well water. Between the home of this witness and the cemetery there. is a public school which is open nine months in the year, in which school are more than three hundred pupils. This school also uses water from a shallow well.

This witness and other witnesses testified that they had never heard of any illness in the neighborhood of Forest Hill Cemetery traceable to the water from these shallow wells.

Adjoining Forest Hill Cemetery is Calvary Cemetery, dedicated as a burial place for people of the Catholic faith and adjoining Calvary is the Jewish Cemetery, dedicated as a burial ground for the people of the Hebrew race. Another large cemetery in the city of Memphis is known as Elmwood Cemetery; and while it is shown that many of the residents living near Elmwood Cemetery use city water, yet it is shown that there are residences all around and adjacent to Elmwood, and likewise there are residences adjacent to Forest Hill, to Calvary and to the Jewish Cemetery, that use water from shallow wells.

We are of opinion from all the evidence that the Chancellor reached the right conclusion in disallowing the injunction. We have given due consideration to the expert testimony and the scientific opinions of the learned witnesses and also the witnesses who testified from practical knowledge, and are of opinion that there is no danger of contamination of complainants' water supply.

It is universally held that a cemetery, either public or private, is not a nuisance per se. On this subject, in Joyce on Nuisances, Sec. 293, it is said:

"Sec. 293. Cemeteries, burial grounds. Neither a private burial ground, nor a public burial ground, or cemetery is a nuisance per se. In order to constitute such places a nuisance clear proof of injury or damage from the manner of burial or

other circumstances peculiar to the particular place must be shown; and the situation, relative altitude and character of the ground, the chance or reasonable probability of pollution or contamination of the atmosphere or of springs, wells or waters, generally, or the danger to the physical comfort, life, and health of those who reside in the neighborhood or immediate vicinity are all factors of importance and should control in the determination of the question whether there exists any nuisance.''

In Railroad Co. v. Cemetery Co., 116 Tenn., 421, the Supreme Court said:

"In the present case it appears that the whole tract was devoted to the public use, when the defendant corporation organized, and purchased the land under its charter. The plan is an entirety. The destruction of any part would mar the whole. It is true that only a small part of the cemetery has been put into actual use for the burial of bodies; but no one can doubt that, situated as it is, so near a large city, all of its domain will be eventually needed for the purposes of interment.''

The court further said:

"In our view, real estate in Tennessee conveyed for cemetery purposes forever, whether to a public or private corporation, or to a board of trustees to have perpetual succession, is ipso facto as a matter of law dedicated to a public use of a sacred character, and forever withdrawn from all the incidents to which other real estate may be liable, so far as inconsistent with its use for burial purposes, including the liability to be taken, or condemned under the power of eminent domain or for secular purposes.''

In Street's American Cemetery Law, page 126, it is said that the "general attitude of the courts on this question is fairly represented by what the Alabama Supreme Court said in the Kingsbury case." (Kingsbury v. Flowers, 65 Ala. 479; 39 Am. Rep. 14). The author then quotes the following from the Kingsbury case:

"Burial places for the dead are indispensable. They may be the property of the public, devoted to the uses of the public; or the owner of the freehold may devote a part of his premises to the burial of his family or friend. It is but a just exercise of his dominion over his own property, and neither adjoining proprietors, nor the public, can complain, unless it is shown that, from the manner of burial, or some other cause, irreparable injury will result to them. It is quite an error to suppose, that of itself a burying ground is a nuisance to those living in its immediate vicinity. Much depends upon the mode of interments, whether it can be justly asserted that, in any event, injury will result from it. The particular locality, and its surroundings, must also be considered.''

Vol. V. T. A.—8.

The general rule deduced from all cited cases, both for and against the granting of injunctions against cemeteries, is thus stated in 5 R. C. L., page 235, section 3:

"As public cemeteries, for the orderly and decent sepulture of the dead, are necessary requirements for all populous communities, private convenience must yield to the convenience of the public in fixing sites for them, and the courts should be particularly careful not to interfere to prevent such establishments, unless the mischief be undoubted and irreparable. The decided weight of authority may be said to be to the effect that a cemetery is not per se a nuisance, and ordinarily in such cases courts of equity will not interfere, but will leave the complainants to an action at law, and unless it clearly appears by competent evidence that a nuisance will be brought into existence by the acts of the parties sought to be restrained and that the party complaining will be injured unless the injunction is granted. Whether a place of interment of the dead is a nuisance depends on the position and extent of the grounds, and especially on the manner in which the burials are effected. If the grounds be arranged and drained, and the burial of the dead be conducted in a proper manner, it will not be a nuisance, either public or private. The unpleasant reflections suggested by having before one's eyes constantly recurring memorials of death is not such a nuisance as will authorize the intervention of equity. It is well settled, however, that it is within the province of a court of equity to restrain the location or maintenance of a cemetery which will endanger the public health or operate as a nuisance. Accordingly, when it appears that a place of sepulture is so situated that the burial of the dead there will endanger the life or health, by corrupting either the surrounding atmosphere or the water of wells or springs, the court will grant its injunctive relief, upon the ground that the act will be a nuisance of a kind likely to produce irreparable mischief, and one which cannot be adequately redressed by an action at law."

The case of McDaniel v. Forest Park Cemetery, 156 Ark., 571, 246 S. W., 874, a cemetery near Forest City, Arkansas was involved. The Arkansas Supreme Court, in that case, said:

"The case presented is an interesting one, and was tried with great care and skill and scientists of national reputation were called as witnesses on both sides.

"The law of the subject seems to be very well settled. In annotated cases of Nelson v. Swedish, etc., Cemetery Assn., 111 Minn., 149, 126 N. W., 723, 127 N. W., 626, 34 L. R. A. (N. S.) 565, 20 Ann. Cas., 748; Lowe v. Prospect Hill Cemetery Assn., 58 Neb. 94, 78 N. W., 488; 46 L. R. A., 237; and Rea v. Tacoma

Mausoleum Assn., 103 Wash., 429, 174 Pac., 861, 1 A. L. R., 541, cite the leading cases on the subject. See also cases cited in briefs of counsel and authorities. cited in the notes to the text in 5 C. J., 56, and 5 R. C. L., 236.

"The Chancellor dismissed complainant's bill in the Forest City case, and the Supreme Court, in affirming the action of the Chancellor, said:

"The testimony does not show that probable injury which must be shown to entitle one to have the location of a cemetery in his proximity enjoined."

In Wahl v. Methodist Cemetery Association, Pa. St., 197; 46 Atl., 913, the decree of the lower court was reversed wherein complainants' injunction was made perpetual against the operation of a cemetery. The court in considering the evidence, said:

"Although dead bodies had been buried in the cemetery for nearly two years before the bill was filed, which was in May 1897, and the testimony was not taken until January 1898, and at that time Henry Wahl, the son of one of the plaintiffs, testified that 97 bodies had been interred in the cemetery some of which were close to the line of Wahl's land, and less than 100 feet from his well, yet neither he nor any other witness testified that there was the least pollution of the water of the well. It seems extraordinary that this should be the condition of the testimony, when the very substance and matter of the controversy was the pollution of this very water. And it is still more extraordinary when it is considered that the plaintiff Wahl proved by the testimony of his witness Dr. Hamilton that dead bodies commence almost immediately after the interment to cast off disease germs, which will be carried off by percolating water."

A recent case on this subject is that of Rea v. Tacoma Association, 103 Wash., 429; 174 Pac., 961, 1 A. L. R., 541. In that case the syllabus is as follows:

"Nuisance—Mausoleum—Injunction. The erection within a few feet of a dwelling house of a mausoleum for the burial of the dead cannot be enjoined as a nuisance, although its presence will cause the inmates of the dwelling unpleasant thoughts and injuriously affect the value of the property, if there will be no fumes or drainage to affect the physical senses or health of those in the neighborhood."

In the opinion in that case the court referred to Monk v. Packard, supra, as a leading case upon this subject, and quoted several passages from it, among others the following:

"Nor can the verdict be sustained upon the sole ground, of the cemetery's proximity to the plaintiff's premises, and the consequent depreciation of the market value of the property. For

a repository of the bodies of the dead is, as yet indispensable, and wherever located, it must, ex necessitate, be in the vicinity of the private property of someone who might prove its market value injurious affected thereby.   New Orleans v. St. Louis's Church 11 La. Ann., 244.''

The court further said:

''No decision has been called to our attention wherein any court has awarded injunctive relief, rested upon the sole ground of the mere presence of a cemetery or other place of sepulture, unattended by injurious or offensive drainage or fumes, sensible to the complaining party, and our own search leads us to believe that no such decisions have been rendered.   Among the decisions holding in harmony with those above quoted from, we note the following:   Lambert v. Norfolk, 108 Va., 269, 17 L. R. A., (N. S.) 1061, 128 Am. St. Rep., 945, 61 S. E., 776; Dunn v. Boston, 77 Tex., 139, 11 S. W., 1125; Elliott v. Ferguson, 37 Tex. Civ. App. 40, 83 S. W., 56; Woodstock Burying Ground Asso. v. Hager, 68 Vt., 488, 35 Atl., 431; Clinton Cemetery Asso. v. McAtee, 27 Okla., 160, 31 L. R. A., (N. S.) 945, 11 Pac., 932; Musgrove v. St. Louis's Church, 10 L. Ann., 431; Westcott v. Middleton, 43 N. J. Eq., 478, 11 Atl., 490.   In the last cited case this view of the law was applied to an undertaking establishment.''

Another case is that of the village of Villa Park v. Manderers' Rest Cemetery, 316 Ill., 226; 147 N. E., 104.   The case arose upon a bill in equity filed by the village of Villa Park, an incorporated town, seeking to enjoin the cemetery company from establishing a cemetery near the town.   On the issues thus presented, the court said:

''A 'cemetery' is a place or area of ground set apart for the burial of the dead.   A cemetery is not created by the use of the tract of land for the burial of the dead, but what creates the cemetery is the act of setting the ground apart for the burial of the dead, marking it, and distinguishing it from the adjoining ground as a place of burial.   Concordia Cemetery Assn. v. Minnesota & Northwestern R. R. Co., 121 Ill., 199, 12 N. E., 536; 11 Corpus Juris 50.   A deed conveying a described tract of land as a cemetery and the prescribing its boundaries would be the dedication of it as a cemetery and the prescribing of its boundaries.

''Burial places are indispensable.   Convenient to the city of the living a depository of the dead must be established and maintained.   It concerns the public health, and if such places were not prepared by private enterprise it would be the duty of the state to act in the premises.   Among the most beneficient acts of government is the legislation which fosters such enterprises

and clothes an aggregate number of citizens with power to adorn and beautify ground which receives the remains of our dead. Such a place is very far from being a nuisance per se and the subject of absolute prohibition by legislative action. Town of Lake View v. Rose Hill Cemetery Co., 70 Ill., 191, 22 Am. Rep., 71.

"A cemetery may be objectionable or offensive to the taste of an adjoining land owner, but its use cannot be enjoined merely because it is offensive to the aesthetic sense of such proprietor. Before it can be abated or its use enjoined as a nuisance it must be clearly and satisfactorily proven to be a nuisance, and this cannot be done by evidence tending to show that it might become such. Sutton v. Findlay Cemetery Assn., 270 Ill., 11, 110 N. E., 315, 11 L. R. A., 1916B, 1135 Ann. Cas., 1917B, 559."

With reference to the alleged sentiment of some persons against living near a cemetery, the Supreme Court of Maine, in Monk v. Packard, 71 Me., 308, 36 Am. Rep., 315, 317, said:

"Cemeteries are not necessarily even shocking to the senses of ordinary persons. Many are rendered attractive by whatever appropriate art and skill can suggest, while to others of morbid or excited fancy or imagination, they become unpleasant and induce mental disquietude from association, exaggerated by superstitious fears. The law protects against real wrong and injury combined, but not against either or both when merely fanciful.

"The human contents of these graves, cannot, as they lie buried there, offend the senses in a legal point of view. The memorial stones alone affect the senses, and the same would result to the superstitious, though nothing human lay beneath them. If this burial ground is under the circumstances a private nuisance, then it is also a public nuisance to every traveller who passes on that road, as well as every soldier's monument in the country."

In the case of Braasch v. Cemetery Assn., 69 Neb., 300, 5 Ann. Cas., 132, the court said:

"In order to authorize a court of equity to interfere, it must be made to clearly appear by competent evidence, that it is reasonably certain that the anticipated injuries will probably occur. The law protects against real wrong and injury combined, but not against either or both when merely conjectural or fanciful. Kingsbury v. Flowers, 65 Ala., 479, 39 Am. Rep., 14; Adams v. Michael, 38 Md., 123, 17 Am. Rep., 516; Begein v. Anderson, 28 Ind., 79; Lake View v. Letz, 44 Ill., 81; Dunning v. Aurora, 40 Ill., 481; Newark Aqueduct Board v. Passaic, 45 N. J. Eq., 393, 18 Atl., Rep., 106; Shievery v. Streeper, 24 Fla. 108, 2 So. Rep., 865; Greencastle v. Hazelett, 23 Ind., 186."

We will next consider the second assignment of error. We are of opinion that the Cemetery Act of 1925 has no application to the instant case because the cemetery was created and dedicated prior to the passage of said act, and this question was settled in the case of C. D. Smith against the defendants in the instant case. The complainant Smith in that case filed a bill against these defendants seeking to enforce the provisions of the Cemetery Act. Complainant Smith owned the land west of the Memorial Park fronting east on Yates avenue. The Smith case was heard upon bill and answer and went upon appeal direct to the Supreme Court, and we quote from that court's opinion, delivered by Mr. Justice Chambliss, as follows:

"This bill was brought primarily to enjoin the defendant from operating as a cemetery a described body of land, dedicated and laid out for cemetery purposes, consistently with charter powers granted by the State prior to the passage of chapter 405 of the Private Acts of 1925.

"Defendant replies that this Act of 1925 relied on by complainants cannot be construed as applicable to it without giving to the act a retrospective or retroactive effect, and that such a construction would destroy its constitutionality, both because the caption is too narrow to cover retrospective legislation and because vested rights would be thereby impaired.

"The learned Chancellor has found for the defendant, denied the injunction and dismissed the bill, and has so fully and clearly set forth his views in his opinion, in which we fully concur, that it becomes unnecessary for us to review the facts or the authorities in detail. Suffice it to say that we are of opinion (1) that the caption does not give notice of legislation which would be retroactive in effect; (2) that the defendant had so far proceeded with its acquisition of the property and the development of its plans before the passage of this act on April 9, 1925, that to give the act application to the cemetery of defendant would retroactively impair seriously its vested rights and work great injury to it, and to those who had acquired burial places for their dead within this dedicated area. It follows that the decree of the Chancellor must be affirmed."

The second assignment is overruled.

The third assignment is to the effect that notwithstanding the Chancellor held no nuisance existed, and denied complainants' right to injunction, still the Chancellor erred in further holding that complainants were not entitled to damages, and erred in refusing complainants a reference to ascertain their damages.

Counsel for appellants in support of this assignment rely upon the following propositions: That the defendant is taking complainant's property without compensation, and in support of this conten-

tion cite Swain v. Tenn. Copper Co., 111 Tenn., 430, 78 S. W., 93 and Madison v. Ducktown Sulphur & Copper Co., 113 Tenn., 331, 83 S. W., 658.

It is further insisted that the Constitution of Tennessee, Art. 1, sec. 21 provides as follows:

"That no man's particular services shall be demanded, or property taken, or applied to public use without the consent of his representatives, or without just compensation being made thereof."

In the two Tennessee cases minor damages were proven and allowed complainants, said damages being caused by the fumes and acids that were emitted from the sulphur and copper smelters, and destroyed the trees and crops and damaged the surroundings of the complainants. Injunctive relief was denied the complainants. However, the facts in the two cases relied on are distinguished from the instant case, in this: Actual damages were proven to the growing crops, killing of shade trees, and the injury to the health of the complainants from the smoke and acids emitted from the smelters.

In Sedgwick on Damages (9th Ed.), Vol. 1, sec. 32, the rule is stated as follows:

"It is only legal injury that sets its machinery in operation; and this is meant by the maxim that damnum absque injuria gives no cause of action. So, if in the prudent and reasonable exercise, by an owner of property, of his right of dominion, another sustains damage, it is damnum absque injuria. So it has been said in regard to a corporation charged with committing a nuisance, 'if the defendants have only pursued the path presented for them by the laws from which they derive their existence, they have committed no wrongful act. Though the plaintiffs may have sustained damage, it is indeed damnum absque injuria; for the act of the law, like the act of God, works no wrong to anyone.' There must not only be loss, but it must be injuriously brought about by a violation of the legal rights of others."

In 1 R. C. L., p. 316, sec. 4, it is said:

"A cause of action presupposes a breach of some duty, and if there is no breach of duty there can be no cause of action. A duty, the breach of which is an actionable wrong and creates a common-law cause of action, may arise from a contract or be imposed by positive law independent of contract, in other words the obligation constituting the cause of action may arise ex contractu or ex delicto."

In the same volume, on page 318, in sec. 5, it is said:

"It is a maxim of the law that damage without wrong does not constitute a cause of action, in other words an act done,

causing damage which the law will redress, must not only be hurtful, but wrongful. There must be damnum et injuria, an act, not merely hurtful but an infringement of another's right. Therefore if a person is doing a lawful thing, in a lawful way, his conduct is not actionable, though it may result in damages to another, for no legal right is invaded."

Joyce on Nuisances, sec. 30, lays down the same principle as announced by Mr. Sedgwick in R. C. L., which we have heretofore quoted.

In Lambert v. City of Norfolk, 118 Va., 269, 61 S. W., 775, 17 L. R. A. (N. S.) 1061, the court held that the loss through diminution in the value of property for residence purposes because of the location of a cemetery near it, is not within the meaning of the constitutional provision requiring compensation in case property is damaged for public use. In the Norfolk case the plaintiff owned and resided on 125 acres of land which was adjacent to the rear of the tract owned by the city. The City of Norfolk established a cemetery on its property. The court said:

"The record shows that the establishment of this cemetery has in no way interfered with any of the plaintiff's rights of property, such as access, rights-of way, water rights, light and air, easements, lateral support, etc., or that the cemetery is being operated as a nuisance. On the contrary it appears that she is offered no such injuries; and while plaintiff's land was used for farming purposes she alleged, however, by reason of the rapid growth of Norfolk the plaintiff expects her land to have a future value for residence purposes, and that the adjacent cemetery will greatly impair its value for such purpose.

"It is clear that the claim of the plaintiff to damages rests entirely on sentimental consideration, and the prejudice that some people have to living near a cemetery. Such considerations as constitute the basis of the plaintiff's claim are not recognized at the common law as ground for a recovery of damages. At common law it was generally damage done to the corpus of the plaintiff's property, or to some right enjoyed by the plaintiff in connection therewith, and not to the feelings, for which a recovery was allowed. The inconvenience had to be something more than fancy or fastidiousness. The law did not recognize damage to the feelings or mind, commonly called 'sentimental damage,' but applied the maxim damnum absque injuria."

The Supreme Court of Virginia cited with approval the cases of Monk v. Packard, 71 Me., 309, supra; New Orleans v. Church of St. Louis, 11 Ann., 244.

The editor of L. R. A., in his annotation of the City of Norfolk case, supra, in a note says:

"No other cases have been found wherein the question was raised, whether the location of a cemetery near property was a damaging of the property within the constitutional provision prohibiting the taking or damaging of the property for public use without just compensation."

We are of opinion that the complainants are disturbed by the location of this cemetery on property adjoining that of the complainants, and that the minds of the complainants, their feelings and aesthetic tastes have been upset.  But we find that the defendants have breached no legal duty that they owe to the complainants and are not subject to respond to the complainants in damages.  The third assignment of error is overruled.

The fourth assignment relative to the bond becomes immaterial as we view the case, and it is overruled.

We approve the findings of fact of the Chancellor, and we find no error in the decree of the lower court.  All of the assignments of error are overruled and disallowed, and the decree of the lower court is affirmed.  Complainants will pay the costs of the cause, including cost of appeal, for which execution will issue against them and their sureties on appeal bond.

Heiskell and Senter, JJ., concur. .